All right. The next case of the morning is number 17, 20750, Renee J. v. Houston Independent School District. We'll hear from Mr. Cuddy first. May it please the Court, my name is Andrew Cuddy, attorney for the appellant Renee J. on behalf of her son C.J. I'd like to focus my time today on one key issue, that being whether or not the IEP, the Individualized Education Plan for C.J. provided him with a free and appropriate public education. The other issues are sufficiently briefed. The Supreme Court elevated the standard of a FAPE in its decision in Andrew F. recently, which established that an IEP must be appropriately ambitious for the child to make progress in light of the child's circumstances. It did not abandon the Rowley language that the IEP be reasonably calculated. Let me provide some which the hearing officer in the district court seemed not to firmly grasp. C.J. cannot recite back to you what his address is. C.J. cannot use a stove. I would appreciate hearing that, but when was he first diagnosed with this complex of disabilities? He's always been classified since early childhood as a student with a disability. However, the autism was not identified until he was 12 years old. So there was a long period of time where he was being treated as a student with another health impairment and a learning disability and his autism was not addressed. So the other health impairment was his eye? Was his what? Eye? Amblyopia or what? No, I think it more related to him having ADHD type of behaviors. So my question is, had he been having regular IEPs? Yes. Okay, that's all I, sorry. Thank you. He cannot use a stove. He reads at a kindergarten or first grade level. He's functionally illiterate. He can only add and subtract single digit numbers. His academic skills are IEP, which included a transition plan that had him targeted to become a law enforcement officer. A transition plan and the services in the transition plan under the IDEA 300.320B requires that they include, of course, a study needed to assist a child in reaching that goal. Now, how can an IEP that indicates the goal of transitioning him to a career in law enforcement be appropriate? Did the parents approve of that? Excuse me, Judge? Did the parents approve of that course of action? The parents did not approve of the law enforcement goal. And in fact, their psychologist was telling them that this was feeding into a perseverative idea that the student had. So no, they did not approve. However, early on in this, the parents did not have legal guidance. They had no administrative type of advocacy support services. And the father is a GED recipient, who is a delivery man. And the mother at the time was a food service worker. Well, what goal did they have in mind? Or now, is he still in school? He is still in school. He's 18 years old. He has three more years of eligibility. And the district is moving forward with this plan because they were not successful at the hearing. Were the parents represented by counsel when they kept him out of school and refused to let him participate in that second summer program? The parents did not refuse to let him participate in the summer program. There was some miscommunication and late communication to the parents about the summer program. Not the second one. But the period of time that he was out of school, that was the period of time where the parents did get in touch with legal counsel and the student did eventually return to school with the guidance of legal counsel. Let me ask, when was the transition plan with that particular goal first created for him? It was created at age, was he? He was 13 and in eighth grade. And in Texas, they're required to have the transition plan put in place by the time the student is turning 14. So they were timely in developing That's a refinement from what the statute itself requires, which is age 16? The statute says 16, and many states have adjusted that, knowing the difficulty in linking students to these after school activities of adulthood. My concern about the transition plan is that looking at the statute itself, it's talking about setting goals, and the Department of Education guidance on this talks about goals in which will focus them on their interests, careers, and abilities. And interests, I'm probably not reading that right, interests, abilities, and goals. So it seems to me that unless there's clear prohibition of it, it would at least seem to leave open that you leave in front of a child, I'm asking you to respond to this, a way to read all of this and tell me why I'm wrong, is to keep in front of the child something he's really interested in, the law enforcement. But to move him towards that goal by trying, ultimately even though it won't work, develop the skills that he's interested, that would help him towards a goal that he's interested in, even if he can never reach that particular goal, it's more of an incentive in front of him, at least in the early stages at 14, certainly, 16, why isn't the mere fact that it's a law enforcement goal and that's what the child's interested in, why is that in and of itself an inappropriate plan? Judge, I wouldn't say that fostering that interest itself is not inappropriate, but we're talking about a student with a 56 IQ, and whatever decision making he's going to be involved in needs to be guided by the more competent and professional adults around him. Well, frankly, I don't see how this transition plan had anything to do with the services he was receiving at school. And maybe you have another issue that you're going to present about fate, but it was concerning to me that he was apparently retrograded, or he went backwards in his ability to read when he got into ninth grade. He certainly has gone backward, and the most recent, I know this is not in the record, but the most recent psychological evaluation, even with his full participation in school now, is showing that he's making no progress towards any of these academic goals. If I may return to Judge Southwick's point there, if we were only to consider the student's interests, we'd have a lot of students whose IEPs would indicate their transition goal is to be a professional football player or basketball player. CJ is a person who right now our office is involved in establishing guardianship over him because he is going to need help and guidance from adults for the rest of his life, and that is not what was occurring in this transition plan development for him. If I may point out, the transition plan indicated that CJ would research law enforcement careers. He reads at a first grade level. It indicated that he would identify and report three habits necessary for a law enforcement career. He writes at a first grade level. The third goal in his transition plan was to research colleges with law enforcement degrees. Colleges, he has a 56 IQ. Well, what would have been an appropriate transition plan? There are... What is his hope of transitioning to anything? CJ is a student who is going to have to transition to supported living. He is going to have to transition to supported employment. He is going to have to have a guardian. What would be supported employment? What can he do? There are adult disability agencies that provide job coaching, that provide on-site support for individuals. Well, you're not familiar with Houston, I guess. I'm not familiar with Houston, being from New York, Judge, but there are programs, non-profit agencies. I'm on a board in one in New York. They have similar boards down here in Texas that provide supported job coaching. The bottom line to me is, if we were to overturn this fate solely because we don't think the transition goal is realistic, what difference does that make to the plaintiff? They're still pursuing this goal with this unreasonable... They're not doing anything. Exactly. I mean, it seems to me that this is just disconnected from the day-to-day reality of what the young man is experiencing in high school, and therefore, it's hard for me to see, and of course, taking Judge Southwick's point into consideration, it's hard for me to see that it's reversible error just because the transition goal is unrealistic, if it is. Judge, the whole purpose of the IDEA is to transition the students to their adult outcome, all right? Well, I've never seen a case... We get a lot of these, as you can imagine, and I've never seen a case where the main reason for overturning the FAPE was, or the IE, whatever you call it, was the inadequacy of the transition goal. It almost always has to do with the procedural business about, you know, did they test the child properly? Did they maintain educational, substantive educational goals, and so on? That statement there, Judge, makes me a little angry. It makes me angry at the parents' bar that is not doing enough to help these students. This student needs to transition to a group home, very likely, when he leaves his parents' home. A group home might have a two- or three-year waiting list. A group home is going to require him to receive transition services in order to get transitioned to that new environment. He's going to need transition services into his supported work environment. HISD's responsibility, it seems to me, is what Judge Southwick said, according to the guidance, which is that transition plan has to deal with his interests, abilities, and goals. And you're going to tell this kid who's fixated. I think the word perseverate is highly ambitious here. He's fixated on law enforcement TV shows, evidently. You can go into such-and-such planned living community, he won't even know what that is, right? And it's our responsibility as the adults and professionals to provide him that guidance. He is not going to make that transition on his own. Yes, sir, and this is all very interesting, but you have time for rebuttal, and I would appreciate your thinking about and responding on rebuttal to this question. How would you ask this court to write an opinion that says that the child is denied a FAPE because of the inadequate transition goal? What would we or the district court be telling the school district that it has to do? Thank you, Your Honor. All right, sir. Mr. Anthony? May it please the court, good morning, Your Honors. My name is Peter Anthony. I am counsel to eight local and national disability rights organizations, and we are participating in this matter as amicus. Thank you so much for allowing us to participate today. We believe that this case raises important questions about what a school district must offer in terms of the level of educational benefits after the Supreme Court's unanimous decision in Andrew F. We submit that Andrew F. effectively overruled this court's prior approach because it rejected the Tenth Circuit's merely more than de minimis standard. It said that the standard for the substantive adequacy of an IEP was markedly more demanding. It said that a school district must offer a plan that is reasonably calculated to enable a child to make progress appropriate in light of that child's unique circumstances. The Supreme Court then went further and said that for certain children, like C.J. here, who are not fully integrated into the classroom, the school district must offer that child an IEP designed to produce progress towards appropriately ambitious goals. What would it be in this case? In this case, it would be—it's hard to say exactly. I would defer to Mr. Cuddy. He's much more familiar with that. It would be goals that the school district's obligation under the IEP, after Andrew, would be to consider his level of benefits and whether those goals are equivalent to grade-by-grade advancement for students who are not disabled. I know the answer to that is no. I'm sorry, Your Honor? I know the answer to that is no. So what plan or what relief would be appropriate? I mean, you say you do this all the time. So, for example, in this case, the law enforcement goal wasn't changing, and so I think under that analysis you would have to ask if that goal was appropriately ambitious. It may actually have been too ambitious, that this was an unrealistic goal. You say maybe? It was too ambitious, so it wasn't appropriately ambitious under— So what would be an appropriate goal for this particular student, if he's still a student? I don't know. Is he still in school? I believe so. I believe Mr. Cuddy said he's still in school. What are they supposed to be directing him to if the rest of his life he's going to be needing to live in a group home? So it would be goals that would be designed to challenge him and increase his ability to live independently, even if that—let's say to be more independent. Again, I would defer to Mr. Cuddy about what specific goals are necessary. We are more concerned with ensuring that this Court's standard for reviewing— Why do you think this Court's standard is inadequate? Because we've had a bunch of cases following Andrew F., and in one of them, albeit unpublished, we said we thought that the Michael F. standard basically was sufficiently similar to Andrew F. So, Your Honor, I disagree that the panel that was Waller said that Michael F. were correlated to Andrew F. Rather, the Court in that case said that the district court's analysis of the IEP was sufficient under Andrew F. In that particular case, the student at issue was actually meeting goals, exceeding them. The school district was adding goals to the IEP. So under that analysis, it would still be the appropriately ambitious goals that Andrew F. requires. This Court has consistently said that an IEP is substantively adequate if it offers more than de minimis benefits. That is what Michael F. said, and ultimately, it concluded that the IEP at issue was sufficient because the objective evidence showed that it offered more than a mere modicum of benefits. I will acknowledge at times this Court has articulated the standard as a meaningful benefit standard. But as we explained in our brief, the way this Court has both articulated and applied the meaningful benefit standard, it actually goes back to a more than de minimis standard. And also, it seems to me that the four-factor test is not really the problem. It's this umbrella concept, a more than de minimis or bottom-line concept, I guess it is. It's not really a problem with the four factors, is there? I would agree that the four factors of Michael F. are all important considerations, and in fact, many of them are required by the plain language of the IDA, such as consideration of the child's unique circumstances, where we believe that the Michael F. standard, as articulated, as you said, is the sort of overarching approach. But it's also in that this Court has consistently said that those four factors are not to be considered in any particular way, and not all four factors even have to be considered. And so we believe, though, that after Andrew F., particularly the fourth factor, which looks to whether there is positive educational benefits, must always be considered, and that if a IEP doesn't satisfy, especially for children not fully integrated into the classroom, doesn't challenge them appropriately, then that is insufficient, and it fails under the IDEA. Thank you. Thank you so much for your time. All right. Thank you. Ms. Tucker? May it please the Court, my name is Amy Tucker. I represent Houston Independent School District in this matter, and with me this morning from the Texas Association of School Boards Legal Assistance Fund is Mr. Chris Brekka and Haley Yanichka. I want to start with the Michael F. issue. I don't think that that issue is actually properly before the Court today. In Appellant's brief, they specifically adopt Michael F. as the appropriate standard to determine what is meaningful educational benefit. They did not raise the issue of whether Andrew changed that standard, and having waived that, I don't think that it's properly before the Court, because absent exceptional circumstances, an issue waived by Appellant cannot be raised by amicus curiae. That's in Christopher M. v. Corpus Christi. Not to mention, back on September 6th, this Court, a panel of this Court heard oral argument in ER v. Spring Branch ISD where the application of Andrew F. to Michael was squarely addressed to the Court by the parties. That decision has not yet issued. I do want to jump to the transition plan. Appellant has been very critical of the transition activities that HIST has engaged in with this child, calling it completely unrealistic. Before you leave that, is it the school district's viewpoint that a de minimis standard, a de minimis sort of bottom line is consistent with Andrew F.? De minimis? It's never been my understanding that Michael F. stood for a de minimis. We certainly have that phrasing, that at least it must provide more than a de minimis. That's in some of our opinions. Well, it's more than. More than de minimis. Okay. And actually the Court speaks to both ends. It says you don't have to. You think more than de minimis is an appropriate consideration. Can that be sort of the catch-all conclusion, so long as it's more than de minimis? I don't think so, and I don't think that's what Michael F. stands for. Well, it certainly seems to have indicated otherwise, but thanks for that candor. Go on. On the transition plan, as the Court, as Judge Southwick, you pointed out, the statute itself tells schools to look at the preferences and interests of the student when they're developing these transition plans, which is exactly what HIST was doing. But the criticism ignores the fact that the goals that were in place, although they were activities could be applied to any number of jobs. Sure. And what's the evidence? Well, first of all, I'm a little mystified about this transition plan issue, because reading through the hearing officer's opinion and the district court's opinion, I saw very little reference to transition plan. And I always infer from the fact that something comes up suddenly in the appeal that it is now. So with that as a given, what evidence is there that he received anything in school at all relating to law enforcement? Well, there would have been the updated IEP goals. That would have been attached. I'm not talking about goals. I'm talking about, what, did they let him watch cops in the classroom? Did they have him talk to, did they have him shake hands with the security officer who came by? I just don't understand. You know, you talk in a vacuum about a transition plan that says the goal of law enforcement, but what was there substantively in school that had anything to do with that? I think what was substantive to this child related to that is learning what good work habits are. Good work habits are going to transition across any number of jobs that he might have. Well, let's see. He regressed from a second grade to a first grade reading level according to the, what we have before us. What work habits did that involve? Well, I think actually with respect to progress, there was a testimony of Mimi Gomez who actually did an item analysis from the 2014 FIE to the 2017 FIE. So she compared item for item whether this child made progress. And she found he made progress in all the major areas, math, reading, writing. And her testimony is at ROA 4988. So I do dispute that this child regressed. To the extent there was regression, it certainly would have been some between January and August when he missed school. There certainly would have been some. And of course, that was right before we retested him in the fall of 2017. But with respect to transition, this child's transition activities were not just limited to his goals. His entire program revolves around transition. The classroom that he is in is called Skills for Learning and Living. The activities they engage in on a day-to-day basis, social skills, brushing teeth, taking care of yourself. It's all day long. It's built into the program. How many kids are in the class? I believe there were nine at the time of this case. And this is within the high school now that you're talking about, not the junior high? Yes. Yes. But it was both. He was in the SLL class in eighth grade. Not that he attended it during the limitations period, but he was in the same class for ninth grade. And then they're mainstreamed into art class in high school? No. Depending on the child, I do believe he went out to regular elective courses, which would have been PE or art, depending on the student's schedule. So with the transition again, so Skills for Learning and Living, you've got, you know, how to apply for a college. And children with disabilities, including those with intellectual disabilities, do go to college now. Programs like HCC, Houston Community College, have programs for children with intellectual disabilities. So it's not, colleges are not the same as they were when we went years ago. If you can read, at a second grade level, they have courses? I'm not specifically, I don't know exactly what it looks like. I do know that there is a child in a school in Colorado who audits the classes. Basically, she has completely different assignments. It's Down syndrome child. Completely different assignment. So they do accommodate children in college to, you know, varying degrees and for different purposes. But it's, how, I mean, even Houston Community College, how do you think these parents could afford him to go to college? And that's something he could research in college applications. That is, that is, I mean, even parents with college education have trouble filling out college applications with their kids. Completely agree. And that's why those things are all done with his teacher in that SLL classroom. He is not told to go off on his own and learn everything these children do in this class. I ask you to, yeah, but I ask you, how could his parents even possibly afford HCC? I don't know if HCC has scholarship programs. I'm not familiar with the payment methods and scholarship opportunities that might be available. It seems to me that the basic argument by the appellants here is the unrealistic transition plan. There's more in their brief, but that's what they've talked about here. And it seems to me, in a way, you're heightening the concern I have about whether the Houston School District and the plan that it has for, and what you're telling us here today, is talking about realism or talking about trying to fit what may be available in some sort of generic sense to a fellow who has very serious problems that don't seem at all consistent with what you're talking about. So, I mean, what we have before us, I mean, Judge Rosenthal is as good as they get, and she looked hard at all of this and accepted even the transition plan, but we have to look at it equally hard. It does seem to me that there's a pretty good factual basis for saying the transition plan and maybe the IEP itself is not a realistic plan. What's your, I mean, the fact that some kids with very serious problems can audit classes seems to me is off the table. That's not what we're talking about here. We're talking about how to do the best that the Houston School District can under their obligation, under IDEA, to assist this child in whatever way is feasible and within the limits of the school and whatever else. I'm not trying to say it's perfection, but what can you tell me to say that this plan actually is a realistic plan? Once the child returned to school in August, September, there were several ARD meetings. We had one in April. We had one in June. Several what? Oh, sorry. Admission review and dismissal meetings where everyone gets together and talks about the plan. There were several of those, and each time the plan was modified. By the time he had been in school by the spring, Dr. Moore, Ms. Payne, the people who were interacting with him testified how much progress he had made because he was in school accessing that program. Ms. Moore talked about he didn't have any behavior problems in her class anymore or did everything he needed to do. He was making progress, especially in math. He was making a lot of progress through the unique curriculum that is implemented in those classes, and that's another thing that helps this child with transition. The unique curriculum that is utilized in these classes is specifically designed for children like him. It's down at his level, and it works on those life skills. There are job skills built into the program. Was Mr. Cuddy correct that he can only add single-digit numbers? I think there was that, and then I think he can do simple multiplication with a calculator I think was in there. I am not arguing that he is not at a low level, but this classroom he was in was specifically designed to help him build on those, and once he started coming consistently and his medications were managed, he's done very well. Even in the independent educational evaluation conducted by Dr. Simeon, he acknowledges that the parent and the student both believe he's doing well in school now and that they're not having any problems there. So I think the argument that he's not doing well or this program is not appropriate for him is not supported by the evidence. What would be the remedy for an inadequate transition plan? What would we do? Write a new transition plan? I mean, it's not that he hasn't had transition activities. To the extent those were not appropriate or perhaps they were too ambitious, we rewrite those goals on a level that is on his level. I'm not acknowledging that those were not on his level. I think if you were seeing it in action with these highly trained special ed teachers, I would think you could see what they see and the progress that they see. There was an issue about providing homebound services and the brief said that you cannot that a prerequisite for providing homebound services was a certified doctor prescription statement that was a medical condition. Why can't it be a mental condition? What the condition has to be is a condition that confines the child to the home so that he is unable to attend school. And that is not just HISD policy. That is actually in the Texas Administrative Code. That 19 Texas Administrative Code 8963C2A. So that's what the school was looking for. They weren't looking for a certain condition. They were looking for something that would confine that child to the home for a minimum of four weeks because it's a very restrictive environment. So the state of Texas has said if you're going to put a child in a program by himself at there's going to have to be a very high standard for that because characteristics associated with autism or intellectual disability, emotionally disturbed children, our schools know how to handle those kids. They know how to program to put behavior plans in place, to put mental health services in place for those kids. I hope that answers your question. Go ahead. So, yeah, with respect to the homebound or what the ESY services I wanted to talk about, part of the appellant's argument in ESY is that the family was not provided prior written notice of that decision to offer ESY and that they didn't tell the campus that the child was coming. And because of that, supposedly, CJ didn't receive those services. That is not the fact scenario that is supported by the evidence. On June 15th, the ARD committee met. Mom and dad were there. ESY services were offered. The problem with that is, of course, that the summer session would have already been underway, right? Correct, it was. There was, I think, a week. Yes, and it's only about six weeks, and you'd probably already done about two weeks of it. So, basically, it was, I mean, that was a fantastic idea. Well, there were actually two summer sessions, and he was offered both. One of them was for June, from June 11th to June 30th. Now, yes, that ARD meeting occurred after the first session had already started, but he was also offered the July 13th through July 30th. That was when they objected to any services at Williams. So, within two days of that, or maybe even the next day of them objecting to Williams, the school called back and offered them one of the specific schools they asked for for those services. And the email said that you've been approved for services at Rice K-8. That's the name of the campus. And the date of services would be July 13th through July 30th. Dad testified. He acknowledged that they received that email and did not respond to it. And that's all HISD knew about it. So the hearing officer in the district court's finding that the record shows that he did receive the required notice, but that his parents decided that he would not participate, that is a finding of fact that is amply supported by the record and would not constitute clear error for this court to overrule and should be approved. Some of the other, I think we kind of touched on this, but one of the issues the appellant raised was about applied behavioral analysis services, excuse me, ABA services. They talk about how HISD refused to provide ABA or predetermined that it would not provide ABA, which, again, the district court's factual findings on that are amply supported by the record. She said the record does not show that the parents requested ABA, and obviously HISD cannot refuse something that the parents never requested. In fact, there was never a specific recommendation for ABA for this child until Dr. Simeon conducted that IEE, that independent educational evaluation, for the hearing. And so at the time of hearing, that evaluation had not yet been reviewed by an art committee. I'm looking at the post-hearing briefs that both parties filed, and they contended that the transition program was insufficient and said something about each of CJ's three IEPs continue the meaningless goal, requiring him to research areas of law enforcement, blah, blah. The baseline for all three IEPs is indicated as 10 percent. HISD's data show no meaningful progress on this. What is 10 percent? And then for other percentages, 10 percent, 30 percent, 60 percent, 90 percent, 20 percent? What does that mean? I think the 10 percent, those are going to be when they update these IEP goals, which they do periodically. They do it at the same time as report cards. So they look at whatever evidence they have, whatever work the child's done. They gauge where he is on that goal, report it on that IEP report, and those go home with report cards. So that means if he's at a 10 percent goal on the transition program to law enforcement, that's not very good. I believe if you look, I want to say that that was the June IEP, though, where he hadn't been in school. But also it says, it said this had been in his IEP for four years, so much for updating and so on. See Exhibit 37 at 1070, reporting percentages since October 2014 of 10 percent, 30 percent, 60 percent, 90 percent, and 20 percent. Notably, the 20 percent is from November 2015, and that is just contrary to the next earlier skill level at 10 percent. Ms. Goffney did not even know that his goal had been in place for several years, and it cites Ms. Goffney, his teacher's testimony. Well, Ms. Goffney would not have had access. She would not have been teaching him those prior school years, the first time she gets him is in high school. So what she knows is going in there what he came. And remember, the October 2014 IEP would have been the last annual ARD. So although there were meetings in April, June, August, September, I don't think that that transition goal would have actually been updated, changed, I mean, like a new one written, because new goals are written every year. So a new one wouldn't have been written until the November 2015, or yeah, October when the new FIE was finished. Do we have anything in the record to show that new goals were written every year? I'm not sure. I know the district court did not go back more than a year because of the one-year limitations that apply to these cases. So I know she would have looked at . . . The October 2014 IEP would have actually been outside the limitations to challenge the actual substance of that. But I do know she did that, looked at that, because it was in place for the last part of eighth grade. And if the Court has no more questions, we have a minute left. I guess not. Thank you. Okay, Mr. Renner. Your Honor, if I may jump right into Judge Jones's question about how relief could be granted in the context of a transition plan. The Texas Administrative Code is much more detailed about a transition plan than the IDEA. In 29.011 and 29.0111, it gives a list of all these different activities that should occur while developing this transition plan. There's about a dozen of them. The ones that are most relevant to C.J. here are that they conduct a functional vocational assessment to determine what his skills are and how they can work with him towards some vocational outcome. Employment goals and objectives. Developing independent living skills with objectives. But perhaps one of the most important of these elements in the Texas Educational Code is linking with appropriate governmental agencies that are going to participate in delivering service to him while he transitions to adulthood and to adult services. So, for example, some of these services might include teaching him how to use transportation, teaching him how to recreate, teaching him how to cook and clean, handling money, job coaching. All of these things are provided often by adult agencies that are working with the disabled, and certainly these are the agencies that should have been brought to these IEP meetings. At the age of 14? There are lengthy lists, often waiting lists. He's 18 now. This is still not occurring as we sit here today. He has three years left of eligibility. Waiting for a spot in a group home might take two or three years to find a spot, and then transitioning into that spot might take a matter of months as well. I mean, I have no doubt that you are correct, but on the other hand, some of this was not in your brief. So, you know, if we said that the FAPE was inadequate because it did not provide a realistic transition plan, is that all we'd have to say or what? I believe the whole educational program has been focused on a transition plan that has been inappropriate for a number of years. In our original hearing request, we asked for these evaluations and for an appropriate transition plan. That was one of the main points of our original hearing request. And all of these issues, every element of this IEP ties into this whole transition issue. I forgot. Were you representing him in the hearing stage? I was not, Your Honor. I picked it up here at the circuit court. Okay. If I may respond to Judge Southwick's comment about more than, merely more than de minimis from the Michael F. standard. That certainly does not equate to the new Andrew F. standard that says ambitious. All right? Michael F., we argued it because it's the standard here in the Fifth Circuit, but Andrew F. has elevated that, and now we have to be ambitious in addressing these children's needs. And Michael F. doesn't use that word. It uses more than, merely more than de minimis. In regards to the, if I can respond to the homebound issue, homebound services is a term of art in Texas and in the school districts here in Texas that is not a special education term. If you look at the continuum of services in the IDEA, it refers to home instruction and hospital instruction and instruction in institutions, and that is what was denied to this student while he was not attending school. They had a student in crisis not attending school, and they had options available. One of them may have been not homebound, the term of art that applies to regular ed kids too, but home instruction that may have been one of the mechanisms to address this child's not attendance. But would that apply to a nonphysical injury, not just a mental? Would it apply to mental issues? Yes, certainly. Certainly. And they did have the parents did provide documentation from a psychiatrist that the district didn't want to honor under their rules for homebound instruction. But this is an IEP issue, home instruction, a placement under the IDEA. And furthermore, they want to blame the parents. The district's case tried to shoulder the parents with this burden of educating this child. If they recognize the parents had issues that need to be dealt with, there are social worker services and there are psychological services that are in the related services of the IDEA that include providing counseling services to students and parents so that they can understand their child's disability and support the implementation of the IEP. Instead, they made weekly phone calls to the family and said, please bring them back to school as if that might have resolved the issue. This was a crisis for this family. But again, I mean, it may well have been a crisis. But again, what kind of remedy can the courts offer at this point in time? That's moot, is it not? It's not moot in the context of trying to do something equitable for CJ, who was deprived of education for five months. And in that context, it might be a matter of extended eligibility or a matter of some sort of other compensatory services during the regular school year that could be provided to address his deprivation of services during that time. All right. Thank you, sir. Thank you. Pleasure hearing from you again. Thank you very much.